**John Brent TARLTON, Jr., Appellant,**

v.

**William B. SAXBE, Attorney General of the United States, et al.**

No. 72–1209.

United States Court of Appeals, District of Columbia Circuit.

Argued June 12, 1973.

Decided Oct. 22, 1974.

Russell H. Carpenter, Jr., Washington, D. C. (appointed by this Court) for appellant.

Lawrence T. Bennett, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and James F. Rutherford, Asst. U. S. Attys., were on the brief, for appellees.

Before BAZELON, Chief Judge, and ROBINSON and WILKEY, Circuit Judges.

BAZELON, Chief Judge:

 John Tarlton, *pro se*, seeks in this action to expunge certain information from his FBI "criminal" file.[1] This information consists of several entries of arrests for which no ultimate disposition is indicated and of arrests and convictions which he alleges were perpetrated in violation of his constitutional rights. Tarlton further alleges that this incomplete and inaccurate[2] information has in the past influenced a court in imposing sentence upon him and influenced the United States Board of Parole in denying him parole on May 9, 1970. He alleges that the future dissemination of this information will cause him similar injury. The District Court dismissed Tarlton's complaint for failure to state a cause of action.[3] For the purposes of ruling on this motion to dismiss, we take as admitted the allegations of the complaint.[4] We reverse and remand for proceedings consistent with this opinion.

1. For a complete description of the FBI "criminal" file system, see Menard v. Saxbe (II), 162 U.S.App.D.C. 284, 498 F.2d 1017, 1020–1022 (1974), rev'g, 328 F.Supp. 718, 720–723 (D.D.C.1971).

While the issue has not been raised by the parties, jurisdiction seems founded on 28 U. S.C. § 1331 (1970). *See* Sullivan v. Murphy, 156 U.S.App.D.C. 28, 50 & n. 34, 478 F.2d 938, 960 & n. 34, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973). Tarlton's standing, a question also not raised in this Court, is assured by Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 140–141, 71 S.Ct. 624, 95 L.Ed. 817 (1951). *See also* Menard v. Mitchell (I), 139 U.S. App.D.C. 113, 430 F.2d 486 (1970) ; Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claims for Relief, 83 Yale L.J. 425, 449–73 (1974). Tarlton's *pro se* complaint presents the sort of dispute that has been traditionally considered justiciable; his claim is ripe for decision. Menard v. Saxbe, *supra*, 498 F.2d at 1023–1024; Sullivan v. Murphy, 156 U.S. App.D.C. at 54, 58, 478 F.2d at 964, 968. Laird v. Tatum, 408 U.S. 1, 13–16, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) is distinguishable by virtue of Tarlton's allegations of past injury. *Cf.* Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

In his original pleadings Tarlton included a claim for damages by reason of the dissemination of his allegedly inaccurate arrest record. However, he has not pressed this claim upon appeal.

2. The information is claimed to be constitutionally inaccurate in that it conveys an arrest or conviction perpetrated in violation of constitutional rights. *Cf.* United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L. Ed.2d 592 (1972).

3. Tarlton v. Mitchell, Civil No. 1862–71 (D. D.C. Dec. 1, 1971).

4. Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174–175, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Tarlton did not in his initial *pro se* pleadings set forth the theory of his action with complete precision. However, a careful reading of his complaint supports the summation given in the text. *Pro se* litigants should not be deprived of their rights due to inexpertly drawn pleadings. *See* Gibbs v. Burke, 337 U.S. 773, 779–781, 69 S.Ct. 1247, 93 L.Ed. 1686 (1949).

## I.

[redacted] Tarlton's complaint leads us into a particularly sensitive area of law, concerning the developing relationship between values of individual privacy and the record-keeping functions of the executive branch.[5] Recently, in Menard v. Saxbe (II),[6] we held that the FBI must expunge information from its criminal file when the local agency which first reported that information to the FBI later reports information disputing the accuracy of the relevant FBI records. Tarlton's claim poses a question not decided in *Menard* (II): to what extent, if any, does the FBI have a duty to take reasonable measures to safeguard the accuracy of information in its criminal files which is subject to dissemination.

Of course, this question is wholly distinct from the question of whether the FBI must guarantee the accuracy of information in its files, and similarly distinct from the question of whether the FBI must resolve conflicting allegations as to the accuracy of its records. As will be developed in more detail in Part III (pp. 1127–1129) below, under present circumstances these latter two questions would not be resolved in Tarlton's favor. Furthermore, we carefully note what is not in issue in this case at all. Tarlton's *pro se* complaint does not challenge FBI dissemination of complete and constitutionally accurate arrests or convictions;[7] nor does it allege that any information, whether accurate and complete or not, has been disseminated to *un*authorized persons.[8]

5. Two notable recent cases have concerned this relationship. California Bankers Ass'n v. Schultz, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). *See* Hearings on Criminal Justice Data Banks Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 93d Cong., 2d Sess. (1974); Hearings on H.R. 13315 Before the House Comm. on the Judiciary, 92d Cong., 2d Sess., ser. 27 (1972).

6. 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974). *Menard* (I) is an earlier version of this litigation. 139 U.S.App.D.C. 113, 430 F.2d 486 (1970).

7. He does by implication raise an issue decided in *Menard* (II): whether the FBI may retain records of police "detentions" for which it knows that no probable cause for arrest existed. *Menard* (II) decided that such interaction between citizen and police was not the kind of criminal activity which may be included in FBI files. The corollary of *Menard* (II) is that arrests or convictions known by the FBI to be unconstitutional are not properly enshrined in FBI files. *Cf.* United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); pp. 1125–1126 *infra*.

The Department of Justice has recently promulgated proposed regulations which limit dissemination of reported criminal activity to "serious and/or significant violations", that is, constitutionally valid arrests. 39 Fed.Reg. 5636, §§ 20.2(c), 20.32 (Feb. 14, 1974). We do not decide in this case whether the FBI may properly retain records of arrests if the accused is later acquitted or the charges are dropped. *Compare* Schware v. Board of Bar Examiners, 353 U.S. 232, 241, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) *and* Gregory v. Litton Systems, 316 F.Supp. 401, 403 (C.D.Cal.1970) *with* United States v. Rosen, 343 F.Supp. 804, 808–809 (S.D.N.Y.1972) *and* United States v. Dooley, 364 F.Supp. 75, 78–79 (E.D.Pa. 1973). *See also* S. 2963, 93d Cong., 2d Sess. §§ 202, 206 (1974); S. 2696, 93d Cong., 2d Sess. § 1 (1973); President's Comm'n on Law Enforcement and the Administration of Justice, Task Force Report: Science and Technology 74–77 (1967) (retention of records of arrest or conviction for unreasonable lengths of time may conflict with rehabilitation goals); Time, July 23, 1973, at 14 (Massachusetts refuses to participate in the FBI records system because that system records arrests even when no conviction has been entered).

8. In Menard v. Mitchell (II), 328 F.Supp. 718, 725–728 (D.D.C.1971), rev'd on other grounds, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974), the court on statutory grounds limited the dissemination of arrest and conviction records to state law enforcement agencies and the federal government. This limitation was in part reversed by Congress in Pub.L. 92–184, 85 Stat. 642, § 902, to authorize dissemination to certain banking institutions and other agencies to be named by the Attorney-General. *See* 28 C.F.R. § 0.85(b) (1974). However, the issue of Constitutional restraints on dissemination is yet to be definitively adjudicated and we, therefore, express no opinion on that issue. We

## II.

■ The Congressional authorization for maintenance of criminal records is 28 U.S.C. § 534 (1970) which directs [9] the Attorney General, among other things, to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records." We held in *Menard* (II) that the statute implies a duty on the part of the FBI, to which the Attorney General has delegated the task of criminal record-keeping, to "take account of responsible information . . . that the 'arrest' record previously submitted did not communicate an information properly retained by the Bureau in its criminal file as an arrest record." [10]

■ We reaffirm the holding of *Menard* (II) and set forth at length the various reasons which not only require implication of the duty discussed above from the open texture of § 534, but go further, providing the legal basis for a more comprehensive view of the FBI's responsibilities in regard to its criminal files. First, as we stated in *Menard* (II), "the FBI's function of maintaining and disseminating criminal identification records and files carries with it as a corollary the responsibility to discharge this function reliably and responsibly and without unnecessary harm to individuals whose rights have been invaded." [11] This corollary is a necessary implication from the grant of power to maintain and disseminate criminal information. Surely a reliable and responsible performance of the record-keeping function requires such reasonable care as the FBI is able to afford to avoid injury to innocent citizens through dissemination of inaccurate information.[12]

■ Second, if the FBI has the authority to collect and disseminate inaccurate criminal information about private individuals without making reasonable efforts to safeguard the accuracy of the information, it would in effect have the authority to libel those individuals.[13] However, we cannot, absent the clearest statement of Congressional policy, impute to Congress an intent to authorize the FBI to damage the reputation of innocent individuals in contravention of settled common law principles.[14] Thus,

also express no opinion on whether the FBI must take a more active role in supervising the use made of FBI records once they are sent to authorized agencies, an area in which there has been a potential abuse of authority. *Menard* (II), at 1026 n. 28. *See also* S. 2963, 93d Cong., 2d Sess. §§ 201–02 (1974).

9. United States v. Rosen, 343 F.Supp. 804, 806 (S.D.N.Y.1972). The Attorney-General pursuant to § 534(c) has delegated this responsibility to the FBI. 28 C.F.R. § 0.85(b) (1974).

10. 498 F.2d at 1029.

11. *Id.* at 1026.

12. *Cf.* Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (1970); Rogers v. United States, 397 F.2d 12 (4th Cir. 1968); Ingham v. Eastern Air Lines, Inc., 373 F.2d 227, 233–236 (2d Cir.), cert. denied, 389 U. S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967); McGill v. United States, 200 F.2d 873 (3d Cir. 1953).

13. At common law, the written accusation that an individual has been arrested or convicted of a crime is actionable *per se*. Lan-

cour v. Herald & Globe Ass'n, 111 Vt. 371, 17 A.2d 253 (1941); Hanson v. Krehbiel, 68 Kan. 670, 75 P. 1041 (1904); Brewer v. Chase, 121 Mich. 526, 80 N.W. 575 (1899). Of course, truth is a complete defense to a libel action. F. Harper & F. James, The Law of Torts § 5.20 (1956). To be sure, the FBI might well assert in such an action that the libel is justified by law enforcement needs or by considerations of federalism. Both of these justifications are discussed pp. 1126–1129 *infra*. However, after Doe v. McMillan, 412 U.S. 306, 324, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), the FBI can assert no absolute privilege.

14. *Cf.* Doe v. McMillan, 412 U.S. 306, 324, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (dictum); Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Watkins v. United States, 354 U.S. 178, 197–199, 205–206, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 139–141, 143, 180, 71 S.Ct. 624, 95 L.Ed. 817 (1951). *See also* Rosenblatt v. Baer, 383 U.S. 75, 86, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

we presume that Congress did not intend through § 534 to authorize the FBI to disseminate inaccurate criminal information without taking reasonable precautions to prevent inaccuracy.

Third, if the FBI had the authority to defame innocent individuals, we would be faced with the gravest constitutional issues. Dissemination of inaccurate criminal information without the precaution of reasonable efforts to forestall inaccuracy restricts the subject's liberty without any procedural safeguards designed to prevent such inaccuracies. That dissemination of inaccurate arrest or conviction records in fact restricts liberty is established by *Menard* (I) [15] and other decisions concerning expungement of arrest or conviction records.[16] Indeed, the whole panoply of constitutional requirements, particularly the right to a speedy trial, activated upon arrest or indictment are designed to mitigate the obvious restrictions on liberty due to public accusation of a crime by the promise of an expeditious and complete hearing to determine the merits of the accusation.[17] To permit the FBI to disseminate inaccurate criminal information without the FBI making reasonable efforts to prevent inaccuracy would be tantamount to permission to accuse individuals of criminal conduct without ever providing such individuals an opportunity to disprove that accusation.[18] Exactly these considerations supported the Supreme Court's decision in Joint Anti-Fascist Refugee Committee v. McGrath.[19]

As a general rule, federal courts interpret federal statutes as consistent with existing law, of which common law principles are a part, unless a contrary legislative intent appears. *See, e. g.,* Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) ; cases cited note 24 *infra.*

15. 139 U.S.App.D.C. at 117–118, 430 F.2d at 490–491.

16. *Menard* (II), 498 F.2d at 1023 *n.* 13, 1024; Morrow v. District of Columbia, 135 U.S.App.D.C. 160, 174, 177–178, 417 F.2d 728, 742, 745–746 (1969). *See* Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) ; Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) ; *cf.* Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) ; ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Probation § 2.3, at 37 (Tent.Draft 1970).

17. *See generally* Barker v. Wingo, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ; United States v. Marion, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) ; Dickey v. Florida, 398 U.S. 30, 41–43, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring).

The one traditional exception is the extraordinary process of a grand jury presentment, which is strictly controlled to protect the privacy interests enumerated in the text. *See, e. g.,* In re Report & Recommendation of June 5, 1972 Grand Jury, 370 F.Supp. 1219 (D.D.C.1974) ; Jones v. People, 101 A.D. 55, 92 N.Y.S. 275 (2d Dep't 1905) ; Note The Grand Jury as an Investigatory Body, 74 Harv.L.Rev. 590, 594–96 (1961) and authorities cited.

18. To be sure, to the extent these accusations are directed toward parole or sentencing authorities, the individual may have an opportunity to rebut the charges. *See* Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ; Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). However, a duty on the FBI to take reasonable measures to produce accurate information for those authorities supports the procedural rights guaranteed at sentencing and parole hearings, since those authorities are themselves required to sentence on an accurate and constitutional criminal record. United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). *See* pp. 1126–1127 *infra.* Furthermore, FBI information is disseminated to a great many agencies other than parole and sentencing authorities. *See* sources cited note 8 *supra.* The individual has no procedural rights before those agencies.

19. 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). *See also* Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In *McGrath,* four Justices, out of eight participating, held that the plaintiff organizations were entitled to an adversary hearing on the truth of the Attorney-General's published claim that they were communist, because the Attorney-General's claim damaged their reputation and ability to function. The fifth Justice, Burton, who wrote the opinion for the Court, held that the plaintiffs were entitled to a trial in the District Court on whether the Attorney-General's claim was reasonable.

In the largest sense, both this constitutional issue and the common law principle forbidding defamation of innocent individuals refer to the value of individual privacy. This value, consistently reaffirmed in recent years,[20] serves to insulate individuals from unjustifiable government interference with their private lives.[21] This value finds its most direct expression in the Fourth and Fifth Amendments;[22] it also is reflected in certain aspects of the First Amendment: government collection and dissemination of inaccurate criminal information without reasonable precautions to ensure accuracy could induce a levelling conformity inconsistent with the diversity of ideas and manners which has traditionally characterized our national life and found legal protection in the First Amendment.[23] Scrupulously avoiding constitutional issues,[24]

---

20. *See, e. g.*, Roe v. Wade, 410 U.S. 113, 152–153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

21. Watkins v. United States, 354 U.S. 178, 205–206, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957).

22. Fourth Amendment: Katz v. United States, 389 U.S. 347, 350–351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886), protecting against searches of private areas unless the government has "probable cause" that a crime has been committed or hidden in that area. Fifth Amendment (Fourteenth Amendment): Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Snaidach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), protecting against deprivations of liberty or invasion of privacy without "due process of law." "Due process" generally refers to procedural safeguards designed to insure that the government is invading a private area pursuant to a legitimate objective, but it, on occasions, has meant that no legitimate governmental objective can justify the invasion. *See* Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *cf.* note 23 *infra.* As stated above, notes 7–8 *supra,* we do not decide here whether the justification for certain kinds of governmental interference via maintenance of arrest records is sufficient to permit that interference.

23. *See* Watkins v. United States, 354 U.S. 178, 196–199, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); Note, Privacy in the First Amendment, 82 Yale L.J. 1462 (1973). *Cf.* Laird v. Tatum, 408 U.S. 1, 25–29, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (Douglas & Marshall, JJ. dissenting); Dombrowski v. Pfister, 380 U.S. 479, 486–487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Boorda v. Subversive Activities Control Board, 137 U.S.App.D.C. 207, 421 F.2d 1142 (1969), cert. denied, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970).

Anderson v. Sills, 56 N.J. 210, 265 A.2d 678 (1970); Note, Chilling Effect in Constitutional Law, 69 Colum.L.Rev. 808 (1969). The following statement by Judge Gesell is particularly instructive:

"Systematic recordation and dissemination of information about individual citizens is a form of surveillance and control which may easily inhibit freedom to speak, to work, and to move [freely] . . .. If information available to Government is misused to publicize past incidents in the life of its citizens, the pressures for conformity will be irresistible. Initiative and individuality can be suffocated and a resulting dullness of mind and conduct will become the norm."

Menard v. Mitchell (II), 328 F.Supp. 718, 726 (D.D.C.1971).

The reality of this danger is illustrated by the facts in Sullivan v. Murphy, 156 U.S. App.D.C. 28, 478 F.2d 938, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); United States v. McLeod, 385 F.2d 734 (5th Cir. 1967); Wilson v. Webster, 467 F.2d 1282 (9th Cir. 1972); Bilick v. Dudley, 356 F.Supp. 945 (S.D.N.Y.1973); Kowall v. United States, 53 F.R.D. 211 (W.D.Mich. 1971); Wheeler v. Goodman, 298 F.Supp. 935 (W.D.N.C.1969); Hughes v. Rizzo, 282 F.Supp. 881 (E.D.Pa.1968). *See also* Wash.Post, June 20, 1974, at Cl. col. 1.

24. *See* Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1967); Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). Even if we were certain that a direct Constitutional attack on FBI dissemination of inaccurate records without reasonable precautions to safeguard accuracy would fail, we would still presume that Congress did not intend through § 534 to change traditional values recognized by existing law, absent a clear legislative statement. *See* United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Kent v. Dulles, 357 U.S.

we interpret § 534 in a manner designed to prevent government dissemination of inaccurate criminal information without reasonable precautions to ensure accuracy.

Fourth, in regard to Tarlton's allegations of unconstitutional arrests or convictions, recognition of a duty on the part of the FBI to make reasonable efforts to maintain constitutionally accurate criminal files is but an exercise of judicial authority to use "remedial mechanisms to redress or obviate . . . constitutional injuries."[25] Generally, courts order expungement of arrest or conviction records to remedy constitutional injuries sustained by reason of such arrests or convictions.[26] We followed such a course of action in Sullivan v. Murphy, *supra*.[27] Furthermore, the FBI as an organ of the national government has a commensurate responsibility to vigilantly support and defend the Constitution and we would not interpret § 534 in a manner inconsistent with this responsibility.[28]

116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1957); Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); Girouard v. United States, 328 U.S. 61, 68–69, 66 S. Ct. 826, 90 L.Ed. 1084 (1946); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082, 1093–1096 (D.C.Cir.1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969) (Bazelon, C. J.).

25. Sullivan v. Murphy, 156 U.S.App.D.C. 28, 55, 478 F.2d 938, 965, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), *citing* Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L. Ed.2d 619 (1971).

26. *See* Wilson v. Webster, 467 F.2d 1282 (9th Cir. 1972); cases cited note 23 *supra. See also* United States v. Doe, Crim.No. 28, 123 (D.C.Super. Aug. 19, 1974).

27. 156 U.S.App.D.C. at 54–63, 478 F.2d at 964–973. Cf. United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

28. Our reasoning in Part II is also supported by Public Law 93–83, § 524(b), 42 U.S.C. § 3771(b) (Supp. III 1973), which in pertinent part requires that all "criminal history information" maintained by "State and local governments" with LEAA funds shall "to the maximum extent feasible" include ultimate disposition for all recorded arrests; all individuals who have criminal history information in the files of state and local governments receiving LEAA funds may obtain access to that information "for the purpose of challenge or correction." This statute fairly bristles with interpretative problems, and is, according to the Conference Report, only an "interim measure" and "should not be viewed as dispositive of the unsettled and sensitive issues of the right to privacy and other individual rights affecting the maintenance and dissemination of criminal justice information." Conf.Rep. 93–401, 93d Cong., 2d Sess. at 32 (1973). To name but a few of the interpretative problems: The statute is not clear whether private parties may enforce its provisions or whether enforcement is committed to the discretion of government prosecutors. *See* § 524(c), 42 U.S.C. § 3771(c) (Supp. III 1973). *Compare* S. 2963, 93d Cong., 2d Sess. §§ 207(b)(6), 301, 308–09 (1974). This confusion is reflected in uncertainty as to what parties would have standing, if any, and as to federal jurisdiction. Furthermore, the statute does not define "maximum extent feasible", although administrative determinations of feasibility would, if the issue were otherwise properly before the Court, be subject to judicial review. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971). The statute defines "criminal history information" in terms of information contained in "automated" record-keeping systems, which may or may not embrace the mass of local record-keeping systems. Finally, the statute suggests that some information could be "challenged or corrected" but does not indicate on what bases.

Without ruling on the issue, we assume for purposes of this decision that the statute does not apply to the FBI. However, the statute does inform our view of § 534. Even though Public Law 93–83 was enacted after '28 U.S.C. § 534, under established authority it may still guide judicial construction of § 534. *See* Girouard v. United States, 328 U.S. 61, 67–70, 66 S.Ct. 826, 90 L.Ed. 1084 (1945); Hutcheson v. United States, 312 U.S. 219, 231–36, 61 S.Ct. 463, 85 L.Ed. 788 (1941). Congress surely cannot be presumed to undercut its action in § 534(b) by intending that the FBI be authorized to receive and disseminate without reasonable precautions the sort of incomplete, unchallengeable information from state or local officials which those officials themselves are forbidden to disseminate. Furthermore, § 534(b) is a relevant source of law which supports implication into § 534 of the general principle that the FBI has a duty to take reasonable measures to maintain accurate criminal records, since the same concerns

■ The four considerations discussed above establish that the FBI is under some duty to prevent dissemination of inaccurate arrest and conviction records. None of these considerations, as framed above, prevent the FBI from disseminating accurate criminal records or, indeed, from disseminating inaccurate records after taking reasonable measures to safeguard accuracy, and thus these considerations do not interfere with legitimate law enforcement objectives. There is, however, as these four considerations establish no legitimate law enforcement objective in disseminating inaccurate criminal records without reasonable precautions to safeguard the records' accuracy. Indeed, the FBI does not here press such a contention. Rather it argues that considerations of federalism and administrative efficiency require that local law enforcement agencies assume the entire burden of safeguarding the accuracy of criminal records. We now turn to a discussion of that issue.

## III.

■ As stated, the four considerations establish the existence of a legally protectable interest for subjects of FBI criminal files. The specific nature of the duty arising from that legally protectable interest cannot, however, be determined by a mechanistic application of the discussion in Part II above. Rather that duty must be accommodated to the particular role the FBI plays in the collection and dissemination of criminal information in the Federal system, the FBI's capacity to take reasonable measures to ensure accuracy and the practicalities of judicial administration and

executive efficiency. Since this case reaches us on a motion to dismiss for failure to state a cause of action, we need not resolve the difficult and sensitive questions involved in reconciling policies of federalism and administrative efficiency with the duty suggested by the discussion in Part II. It is enough at this stage of the litigation to state that this duty is sufficiently developed to convince us that more judicial inquiry is needed. Therefore, we remand the case for such further inquiry.

The record in this case and the experience gained in the *Menard* litigation are, however, sufficient for us to suggest the following avenues of investigation in the remand hearing. The discussion that follows seeks only to define the kind of facts which may bear upon the issues open at that hearing. The FBI will, of course, have an opportunity to suggest countervailing considerations. Our purpose here is to frame issues, not dictate conclusions.

■ The first issue is the precise nature of the FBI's responsibility. The FBI here, as in *Menard* (II), presses the contention that it is a mere repository for information collected and recorded by state and local agencies and thus is not responsible for any inaccuracies in that information. Passing the issue of whether the FBI may disclaim responsibility for injuring innocent individuals merely because of its status as an agent, *Menard* (II) quite clearly holds that the FBI is more than "a mere passive recipient of records received from others." [29] Rather the FBI "energizes those records by maintaining a system of criminal files and disseminating the criminal records widely, acting in effect as a

---

which led Congress to impose a duty on state and local law enforcement officials in regard to their criminal files apply equally to the FBI and its criminal files. *See* Conf. Rep., *supra*, at 32. *See also* S. 2963, 93d Cong., 2d Sess. § 101 (1974) ; *Hearings, supra* note 5. Another statute that serves as a relevant source of law is the Consumer Credit Protection Act, 15 U.S.C. §§ 1681g–1681j (1970). For recent examples of the use of statutes as relevant sources of law,

see Moragne v. States Marine Lines, Inc., 398 U.S. 375, 390–392, 90 S.Ct. 1772, 26 L. Ed.2d 339 (1970) ; Welsh v. United States, 398 U.S. 333, 345–361, 90 S.Ct. 1792, 26 L. Ed.2d 308 (1970) (Harlan, J. concurring). For a collection of scholarly authority, see Note, The Legitimacy of Civil Law Reasoning in the Common Law: Justice Harlan's Contribution, 82 Yale L.J. 258 (1972).

29. 498 F.2d at 1026.

step-up transformer that puts into the system a capacity for both good and harm." [30]

■ It is also suggested that the following disclaimer on each FBI record disseminated to persons outside the FBI establishes that the FBI is merely a repository for information collected by others: "Information shown on this Identification Record represents data furnished FBI by fingerprint contributors. WHERE FINAL DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE IS DESIRED, COMMUNICATE WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS." While we commend the FBI for inserting this warning, we cannot find that it absolves the Bureau of its responsibilities, whatever they may be, toward information it disseminates. We would think this argument had been rejected by *Menard* (II). Even if that entirely reasonable conclusion may for purposes of argument be set aside, we think that the realities of the dissemination network nullify any impact the above-quoted disclaimer might have in detering reliance on information disseminated by the FBI. First, a sentencing judge or parole agency is not in a position to check the accuracy of every FBI file it receives. Those authorities have no direct contact with local law enforcement agencies or a permanent staff to handle questions concerning the accuracy of arrest and conviction records. And other agencies or individuals who have access to FBI criminal records would have even less ability to check on the accuracy of those records. Second, sentencing and parole authorities are in a position where they must rely on some source for information about an accused or convicted individual. The easy availability of FBI records and the extreme difficulty of obtaining the information on their own make virtually blind reliance on the FBI records a practical necessity. Third, the subject of the files, often imprisoned and more often without the intellectual or financial capacity to conduct a personal investigation into the facts of distant arrests or convictions, will seldom be able to effectively challenge the accuracy of information distributed by the FBI before a parole board or sentencing judge. In sum, the FBI may not disclaim responsibility for the system it has created through insertion of a printed warning on the records it disseminates.

■ There are, however, practical limits to the FBI's responsibility. "Realistically, the FBI cannot be expected to investigate the facts underlying every arrest or detention reported to it. . . . ." [31] Such a duty would place a potentially huge administrative burden on the FBI. Furthermore, in the case of alleged unconstitutional arrests or convictions, the FBI is not authorized or equipped to make judgments concerning what might be difficult questions of constitutional interpretation. Finally, considerations of administrative efficiency and federalism suggests that the "primary duty of executive inquiry into the facts of distant arrests is a burden assigned more appropriately to the local agency whose officials made the arrest [or conviction] than to the FBI." [32]

■■ Similar reasons limit the relief United States courts in this district may legally and practically grant to litigants in Tarlton's position. The District Court cannot review the constitutionality and relitigate the merits of all the arrests and convictions in the United States.[33] Furthermore, considerations

---

30. *Id.*

31. Menard v. Mitchell (I), 139 U.S.App.D.C. at 122 n. 51, 430 F.2d at 495 n. 51. (Bazelon, C. J.).

32. Menard v. Saxbe (II), 498 F.2d at 1025. *Cf.* United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).

33. The District Court here would be an inconvenient forum. *See* 28 U.S.C. § 1404(a) (1970) ; Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508–509, 67 S.Ct. 839, 91 L.Ed. 1055 (1946).

of federal-state comity [34] would seem to require that local courts which supervised the arrest or entered the conviction under attack should make the initial determination as to the validity of that arrest or conviction. Finally, of course, in the ordinary case the District Court cannot order expungement of information from the files of local governmental agencies since it would have no jurisdiction over those records.[35]

These limiting considerations unequivocally establish that the FBI is not and cannot be the guarantor of the accuracy of the information in its criminal files. However, as established in Part II of this opinion, neither can it

34. *See* Younger v. Harris, 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Fay v. Noia, 372 U.S. 391, 417–420, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Morrow v. District of Columbia, 135 U.S.App.D.C. 160, 173, 417 F.2d 728, 741 (1969); Developments in the Law-Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1093–94 (1970). Since the expungement of arrest or conviction records is a form of collateral attack, the habeas corpus case law on exhaustion of state remedies, is a particularly persuasive, if not controlling, analogy.

The policy of federal-state comity while applicable to requests for expungement of arrest records does not prevent expungement actions directed against the FBI prior to a successful expungement action in the local court of the jurisdiction which first provided the disputed record. *See Menard* (II), 498 F.2d at 1025–1028. To be sure, Menard did seek redress from state officials before bringing his action in the District Court of this district, but he did not obtain expungement in state court. To the extent Menard exhausted his state remedies, Tarlton will exhaust his remedies to the same extent if the FBI exercises a duty of inquiry such as is suggested on pp. 1129–1130 *infra*. Furthermore, Tarlton's action, seeking as it does a determination of the FBI's *federal* duty created by a federal statute, involves certain undeniably federal issues such as the existence and extent of a duty of inquiry.

Notably the persuasive analogy to habeas corpus doctrine supports this result. Exhaustion of local remedies is required only where state courts can provide full relief. Fay v. Noia, *supra* 372 U.S. at 434–435, 83 S.Ct. 822, 9 L.Ed.2d 837; 28 U.S.C. § 2254(b) (1970); Developments in the Law, *supra* at 1097–1103. Here state courts cannot expunge FBI records and thus the relief they could grant is inadequate. Although the state court presumably could order the local agency to request return of the records in issue, requests which are at present routinely honored, *Menard* (II), 498 F.2d at 1025, this places the plaintiff's remedy at the discretion of the FBI. We do not consider this adequate. Furthermore, many state courts may not grant expungement of local records. *E. g.*, Spock v. District of Columbia, 283 A.2d 14 (D.C.App.1971). *See* Comment, Retention and Dissemination of Arrest Records: Judicial Response, 38 U.Chi.L.Rev. 850 (1971). Under habeas corpus futility doctrine, this is grounds for immediate federal review. *See* Sullivan v. Murphy, 156 U.S.App.D.C. at 52–54, 478 F.2d at 962–964; Developments in the Law, *supra* at 1099. Even if a state court would grant expungement, it is unclear whether it would order local officials to request return of FBI records. Finally, we would be most hesitant to remit Tarlton to suits in state courts when, as here, over twenty different arrest entries are in issue and there is no showing that the states involved permit expungement.

In addition to the foregoing considerations, we note that courts in this district have traditionally reviewed the national policies of federal agencies in order to establish for all courts a consistent set of standards to guide that agency. *See* Nestor v. Hershey, 138 U.S.App.D.C. 73, 90–91, 425 F.2d 504, 521–522 (1969) (Robb, J.). This traditional concern is applicable to the FBI. We also note that once the FBI begins to comply with any duty required by § 534 as interpreted by the District Court after remand, if any such duties are imposed, all injured parties must exhaust their administrative remedies within the FBI.

It is also suggested that we transfer this case to the federal district in which Tarlton is presently imprisoned or is presently on parole. Whatever might be the merits of such a suggestion, it has no merit in this case since Tarlton has already exhausted his remedies before the parole board and on appeal from the parole board decision. *See* Tarlton v. Clark, 441 F.2d 384 (5th Cir.), cert. denied, 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971).

35. This Court has applied limits of this sort in the analogous area of venue for challenges to denial of parole. *See* Starnes v. McGuire, 168 U.S.App.D.C. —— at ——, 512 F.2d 918 at 931 (D.C.Cir., Nov. 8, 1974) (en banc).

avoid all responsibility for inaccuracies which injure innocent individuals. The task of the District Court is to consider by the standard of reasonable care within the FBI's capacity where between these extremes a proper definition of FBI responsibility may be found. We held in *Menard* (II) that the FBI has a duty to take notice of responsible information furnished by local law enforcement agencies. The District Court may inquire whether persuasive reasons exist for not extending this duty to a more general duty to request of local law enforcement agencies the factual bases, if any, of allegations submitted to the FBI challenging the accuracy of prior information submitted by that local agency. Such a duty could not include, for the reasons discussed above, a requirement that the FBI resolve factual or legal issues that might arise if the allegations of the individual subject of the record and the statements of the local law enforcement agency conflict. Neither could the exercise of such a duty give rise to a legal obligation on the part of the FBI to guarantee the accuracy of records which are the subject of an FBI request to a local law enforcement agency.

We are not at this stage of the proceeding informed as to what arguments or administrative justifications the FBI might bring forward to explain its present failure to undertake this general duty. For example, one might plausibly argue that the sheer expense of the exercise of such a general duty might indicate that the duty should not be imposed. We are, to be sure, very hesitant to limit a duty absent the most compelling administrative justification. We withhold any final judgment, however, until the FBI has been given a full opportunity to express its views and the District Court has evaluated the evidence adduced at the remand hearing.

Because of the general nature of our mandate in this opinion, we feel compelled to make some tentative suggestions to the District Court concerning the specifics of this general duty of inquiry. We emphatically state that these are only suggestions which the District Court may, in its discretion, consider. First, the District Court may well wish to inquire whether persuasive reasons exist which might justify the failure of the FBI to keep its files reasonably current, i. e. the failure to indicate a disposition within a reasonable time after the entry of an arrest.[36] Second, the District Court may wish to consider whether the FBI should upon request of an individual detailing allegations of inaccurate entries in his FBI criminal file forward those allegations to the relevant local law enforcement agency with a request for comment or contradiction. Third, the District Court may wish to review the present FBI forms for use by local law enforcement officials in submitting criminal data to determine whether it is reasonable to revise those forms to require the reporting of additional information about the crime which is the subject of the submission.

A further specific duty which the District Court, in its discretion, may wish to consider is a duty to grant a right of access for individuals who are the subject of FBI criminal files for the purpose of examining their FBI files for errors. In inquiring as to the practicality and efficiency of such a duty, the District Court might review whether this right of access should be absolute or granted only upon threat of injury from dissemination of the criminal record.[37] Finally, in this inquiry, the District Court may consider whether the injured individual should have a limited opportunity to explain or clarify information contained in his file either by placing a

---

36. We note that pending this appeal, the FBI has indicated that it will expunge all arrest records more than one year old for which no disposition is reported. Wash.

Post, June 25, 1974, at A2, col. 4. *See also id.*, June 20, 1973, at A1, col. 3.

37. *Cf.* Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

short statement in the file or by indicating on the file itself that certain information is challenged.[38]

The learned arguments of the dissent invite a brief rebuttal. Our remand, it is argued, requires the District Court to perform the awesome task of administering the FBI through "judicial amendment" to § 534. Such projects, according to the dissent, are not the business of courts. Even if we were to concede, which we most certainly do not, that our remand may ultimately result in a mandate as extensive as that conjured by the dissent, we would still consider our holding a proper exercise of the judicial function, consistent in every respect with the traditional roots of judicial power. One might cite as random examples the control of work-related injury and the costs of technological advance through personal injury litigation; the administration of the system of free enterprise through enforcement of business promises and the protection of tangible and intangible property interests; and, most relevant to the dispute *sub judice*, the reconciliation of individual interests in reputation with other important social interests such as political debate and free economic competition through the law of libel and slander. This tradition of judicial temerity has maintained its vitality in recent years as the examples of school desegregation and reapportionment litigation amply attest. We certainly cannot foresee anything similar to such administratively awesome tasks as these resulting from the ultimate disposition of this case. But these examples do demonstrate that the distinction of the judicial function lies not in the administrative difficulty of the task it is urged to perform but rather in the existence *vel non* of a legally protectable interest, a "right", a "cause of action."

On that score, the dissent has precious little criticism of our result. To be sure, there is the general assertion that we may presume from Congressional silence an intent in § 534 to alter established common law and constitutional interests. Not only is this argument singularly unpersuasive to us, it does not even seem to fully persuade the dissentor who, a close reading of his opinion will establish, apparently sees a sufficiently significant legal interest to suggest disclosure of FBI criminal files and a right to reply for injured subjects of those files.

 Reduced to essentials, our colleague's concern in this case seems to be that the cost and administrative difficulty of implementing the duty of inquiry tentatively suggested in our opinion conclusively demonstrates the impracticality of establishing such a duty as a remedy for injury to a legal interest. We might at a later time concur in this judgment. Certainly such a result is not foreclosed in the least by our holding or the reasoning offered in support of it. On the contrary, we expressly hold that cost and administrative efficiency must be weighed in ascertaining what if any legally protectable federal interest accrues to the subjects of FBI criminal files. For the present, however, we are not confident the dissent's judgment can find sufficient support in the bare record presented to us here. For expressly and specifically that reason we have decided upon the remand explicated herein.

---

38. Such a duty is supported by the statutory analogies discussed in note 28 *supra*. It is also supported by analogy to the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which in effect grants access for defendants to exculpatory material in the government's possession. *See* United States v. Bryant, 142 U.S.App. D.C. 132, 439 F.2d 642 (1971); Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209 (1968); *cf.* Fed.R.Crim.P. 16(a); United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); United States v. Mendez–Rodriquez, 450 F.2d 1 (9th Cir. 1971); Peoples v. Hocker, 423 F.2d 960 (9th Cir. 1970). *See also* Freedom of Information Act, 5 U.S.C. § 552(b)(7) (1970) (exemption does not apply to materials which may be obtained through normal criminal discovery. H.R.Rep.No.1497, 89th Cong., 2d Sess. at 11 (1966)).

Perhaps we should add, lest our view be misunderstood, that we would welcome legislative action designed to meet the issues discussed in our opinion. The Congress has at its disposal the resources and fact-finding apparatus sufficient to accomplish the objectives of this remand and has a more flexible range of enforcement techniques to realize the conclusions of such an inquiry. Furthermore, the Congress is the appropriate institution to determine whether established common law and constitutional interests should be limited in service of other important social interests. A Congressional judgment on such matters will, of course, be conclusive upon us, if consistent with our constitutional responsibilities. However, we cannot refuse to adjudicate cognizable legal claims involving substantial personal interests on the possibility, no matter how devoutly we might wish it, of future legislative action.

### IV.

In conclusion, we wish to again emphasize that we hold only that Tarlton has, at this stage of the proceedings, stated a cause of action. This cause of action relates to a possible duty of inquiry to be placed upon the FBI, the existence of which is a question for the District Court after conducting a hearing in which the FBI may fully present factual material and legal arguments bearing on the issues raised in Part III above. We, therefore, reverse and remand to the District Court for proceedings consistent with this opinion.

So ordered.

WILKEY, Circuit Judge (dissenting):

With a full appreciation of the earnest and sincere purpose animating my two colleagues, I must respectfully dissent. To my mind the only logical result for this court to reach is to affirm the District Court's dismissal of appellant Tarlton's complaint for failure to state a cause of action.

My disagreement rests on three grounds:

1. What this court does, on the thin basis of finding a cause of action in an individual prisoner's complaint, is to thrust upon a single judge of the United States District Court for the District of Columbia the task of Congressional oversight on the operations of the FBI, with directions to devise an appropriate judicial amendment of the relevant statute, 28 U.S.C. § 534, if the District Court's inquiry finds that additional legislation is needed.

2. Surprisingly, in its effort to determine how the FBI is doing its job and what further legislation is necessary, the court seems to have largely overlooked appellant Tarlton, the legalities and practicalities of the relief he sought, and has impliedly ruled against him on all his principal points.

3. The further legislation, which the opinion makes clear is obviously desired, although its exact nature is to be determined after the District Court makes a broad inquiry, will inevitably compel the FBI to undertake the monumental task of passing judgment on the "constitutional accuracy" of the criminal information contained in the FBI fingerprint arrest file.

### I. CONGRESSIONAL OVERSIGHT AND LEGISLATION

It is difficult to articulate the remarkable metamorphosis this case has undergone from the case as argued to us. As a result, the majority opinion virtually ignores the appellant Tarlton,[1] the facts of his situation, the three types of relief he sought, his standing, and the other legal points brought before us on appeal. By saying Tarlton has "stated a cause of action" and then remanding to the District Court, the court here is obviously using Tarlton's

---

1. The name of "Tarlton" or "appellant" or "he" or "him" is only used a total of 14 times in the entire majority opinion (12 of these references being in the first 2 pages), and used not once in Part III, the really operative part of the opinion.

complaint to undertake a full-scale legislative inquiry of national scope. This conclusion is not vitiated by such language in the opinion as "recognition of a duty on the part of the FBI to make reasonable efforts to maintain *constitutionally accurate* criminal files is but an exercise of judicial authority to use 'remedial mechanisms to address or obviate . . . constitutional injuries.' " What the court is doing is amending section 534 to require the FBI to do many more things than the Congress required, most of which may turn out to be impractical, and none of which can be asserted to be required constitutionally.

The breadth of the inquiry which the District Judge is directed to make, Parts II, III and IV of the majority opinion, clearly shows the legislative nature of the task entrusted to him. The vehicle of this legislative oversight and amendment (interpretation) of section 534 is a direction to a District Judge in one judicial district to conduct an inquiry of the broadest range based on the allegations of one defendant. The inquiry involved is the type which a Congressional committee is supposed to make, taking into account data on a nationwide basis from all interested parties, before drafting and enacting legislation. This court thrusts on one District Judge sitting in the District of Columbia a task of national scope. Of course, this court sits ready to shoulder some of his burden by review of his findings.

My two colleagues have apparently decided that section 534 must be amended, that the FBI can no longer be left to do only what Congress empowered it to do, *i. e.*, acquire, collect, classify, and preserve criminal records, and exchange that information with other authorized bodies concerned with such matters. The issue as phrased by the court here is: "To what extent, if any, does the FBI have a duty to take reasonable measures to safeguard the accuracy of information in its criminal files which is subject to dissemination?" This phrasing is innocuous enough, until one realizes what the real thrust of the court's direction is. The words "accurate" or "constitutionally accurate" occur innumerable times in the majority's discussion as to what the FBI should be required under section 534 to do. This, of course, necessarily implies that *the FBI must pass judgment on* what is "accurate" or "constitutionally accurate" before disseminating the information, a point which will be discussed at length later.

If there is a constitutional requirement affecting the FBI's operation, this court has a right to say so. If there is no constitutional requirement but only a statutory one, neither this court nor the District Court has a right to make a legislative oversight inquiry to determine the need for additional legislation. Under the guise of interpreting a statute, a court cannot make a general inquiry into the manner in which the FBI carries out its responsibilities under section 534. In particular, this court cannot compel the FBI to vouch for the "constitutional accuracy" of all criminal information it disseminates because such an "interpretation" is so completely foreign to section 534 that it would constitute a drastic amendment of the statute by judicial fiat.[2]

---

2. 28 U.S.C. § 534 provides:

§ 534. Acquisition, preservation, and exchange of identification records; appointment of officials.

(a) The Attorney General shall—

(1) acquire, collect, classify, and preserve identification, criminal identification, crime, and other records; and

(2) exchange these records with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.

(b) The exchange of records authorized by subsection (a)(2) of this section is subject to cancellation if dissemination is made outside the receiving departments or related agencies.

(c) The Attorney General may appoint officials to perform the functions autho-

In light of the concluding paragraphs of the majority opinion, I think it is necessary for me to emphasize the exact sense in which I use the term "Congressional oversight." Certainly a large element of my concern in this case lies in the fact that we are asking the District Court to engage in a broad-ranging inquiry into the satisfactory working of the FBI. However, the thrust of my interest is the rationale for this inquiry. Congress has a general responsibility to see to it that Executive agencies are satisfactorily performing their duties. Congress also has the responsibility of making the laws, a duty which oftimes requires an inquiry into the functioning of agencies and their operations. The courts have neither of these responsibilities.

However, incident to litigation before them, they will require changes in governmental procedures and operations when the manner in which an agency operates violates constitutional or statutory rights. In this case, the court refuses to say that the Constitution requires the FBI to make an inquiry as to the legality of each arrest in its records. Similarly, I do not believe that Congress in section 534 intended to place such a burden on the FBI. Therefore, the inquiry which the District Court will have to undertake will be legislative in its most fundamental sense, in that its purpose will be the legislative one of deciding whether it would be *preferable* (as opposed to constitutionally or statutorily required) for certain changes to be made in FBI procedures.

## II. TARLTON

Having virtually forgotten about Tarlton in the lengthy period this case has been under most serious consideration, the majority find "a cause of action" in the complaint in order to direct the District Court to conduct a legislative inquiry into the functioning of the FBI, but in so doing they negate Tarlton's claims for relief. An examination of these claims, the basis for this entire cause of action, is necessary to make this clear.

Appellant Tarlton is a federal prisoner; at the time of oral argument he was on parole.[3] He brought this action against the Attorney General and the Director of the FBI to compel either a modification of FBI records relating to appellant or an injunction restraining the appellees from presentation of such records to federal courts and correctional officials. (A third claim for damages was not pressed on appeal.) He alleges that he was originally denied parole because of his long history of arrests and convictions supplied to the Parole Board by the FBI.

"Appellant does not deny that he was in fact arrested and convicted as shown by his FBI record,"[4] but he alleges that a large number of the arrests and con-

rized by this section. Added Pub.L. 89–554, § 4(c), Sept. 6, 1966, 80 Stat. 616. This provision was amended in part by Pub. L.No.92–184 (15 Dec. 1971), § 902, which reads as follows:

Sec. 902. The funds provided in the Department of Justice Appropriation Act, 1972, for Salaries and Expenses, Federal Bureau of Investigation, may be used, in addition to those uses authorized thereunder, for the exchange of identification records with officials of federally chartered or insured banking institutions to promote or maintain the security by those institutions, and, if authorized by State statute and approved by the Attorney General, to officials of State and local governments for purposes of employment and licensing, any such exchange to be made only for the official use of any such official and subject to the same restriction with respect to dissemination as that provided for under the aforementioned Act.

3. Appellant was actually granted parole subsequent to the filing of his brief on appeal, but remained subject to the jurisdiction of the Parole Board. From the FBI fingerprint record of arrests and convictions, by agreement of counsel furnished and made a part of the record after oral argument, we learned that on 12 February 1973 appellant was arrested for carrying a prohibited weapon, on 28 March found to be a parole violator, and on 6 June 1973 returned to the U.S. penitentiary at Atlanta, Georgia. See Appendix, pp. 1146–1147.

4. Appellant's Brief, p. 19.

victions were invalid. At the time of appellant's first eligibility for parole, his FBI record contained a total of 21 entries spanning 20 years. In five of these entries, he alleges, either no charges were brought after arrest or the grand jury refused to indict. In four other cases (three charges for "drunkenness" and an illegal U-turn) appellant does not dispute the substance of the charges.

In the remaining 12 cases appellant asserts that the charges were either false, the detentions were illegal, or that convictions were obtained by violating his constitutional rights. Several of these 12 were vagrancy convictions, which appellant contends were based on charges under unconstitutionally vague statutes. Two convictions for theft and one for assault, three of the most serious charges, were allegedly obtained without affording appellant assistance of counsel in contravention of appellant's constitutional rights.[5] Appellant contends that he was subsequently cleared of a fourth serious conviction (burglary), but admits that a conviction for escape from prison (assertedly prompted by his detention on the false burglary charge) was obtained after a trial in which he was represented by counsel, and that he did in fact escape from what he claimed was unlawful detention.

In sum, appellant contends that his apparently long history of criminal involvement is not a true reflection of the facts. Through a combination of poor luck and injustice, he has allegedly been characterized as "a professional criminal" when in fact he is a relatively innocent victim of circumstances.[6] To some extent we would all agree with appellant; part of his record is that of a ne'er-do-well, one of life's losers, not necessarily a "professional criminal." Never was appellant Tarlton able to proclaim, "I am the master of my fate, I am the captain of my soul." Tarlton staggered from blow to blow.

In the District Court appellant sought to have his FBI record altered to reflect what he contends is the true nature of his past record,[7] purged of all its present contents except for the four minor convictions, the validity of which he does not contest. The Government argued that it is under no duty to alter its records unless it *knows* them to be false;[8] for example, the FBI will delete

---

5. If Tarlton was without the assistance of counsel when he was prosecuted and convicted, the resulting convictions would probably be invalid. However, the present action is the wrong channel for bringing up this matter. Rather, as indicated in Part V of this opinion, a means should be afforded a defendant in judicial proceedings and before parole boards, when arrest records are being used, to correct inaccurate or misleading entries.

6. Since appellant's action below was dismissed for failure to state a claim upon which relief could be granted, he was never given an opportunity to prove the facts alleged in his complaint. We therefore assume on this appeal that the facts he alleges regarding his criminal record could ultimately be established as true, although, as discussed later, the FBI fingerprint record, part of the record on appeal subsequent to oral argument, shows that appellant has slightly exaggerated the number and importance of incomplete entries. See Appendix.

7. Appellant asked the District Court to declare that the presentation to courts and correctional officials of the false and illegally created information in his FBI files is unconstitutional and to enjoin the further presentation of such information. Appellant also requested copies of the complaints against him and various other records pertaining to his past arrests. In addition, he sought damages to compensate him for his imprisonment.

This opinion deals at length with appellant's first requested relief. With regard to appellant's request for a copy of his FBI arrest and conviction record, the Government has made that a part of the record in this case; such issue is now moot. It is obvious from appellant's detailed and almost exact knowledge of the offenses shown on his FBI fingerprint record (cf. Appendix) that at some time he had been informed of its contents. In this court appellant did not press his request for monetary damages.

8. The Government states in its brief, "The FBI has a responsibility not to disseminate arrest information which it knows to be false." Government's Brief at 7. *See* Menard v. Mitchell, 139 U.S.App.D.C. 113, 430

an entry of an arrest only if it ascertains, usually from the agency reporting the arrest, that the arrest did not in fact occur. The Government denied any obligation to inquire into the probable cause for an arrest or the fairness and legal accuracy of a conviction, or the constitutionality of either. Such arguments of validity and constitutionality, in the Government's view, are more appropriately made to local authorities, who are closer to the facts and records of the case and thus in a better position to make such evaluations. If the local authorities determine that an arrest or conviction was invalid, they may ask the FBI to return the record of the event and it is FBI policy to do so.

Consistent with the Government position in Tarlton's case, that the FBI can be held accountable for anything it *knows* "in Menard v. Saxbe (II), we held that the FBI must expunge information from its criminal file when the local agency . . . later reports information disputing the accuracy of the relevant FBI records" (Majority Opinion, p. 1121).[9] But Tarlton's case is not Menard's case; there is no evidence and no claim that any local agency ever reported one item of information casting

doubt on Tarlton's fingerprint arrest record.

Tarlton asks us to thrust on the FBI a retroactive duty of affirmative inquiry. This alone will satisfy Tarlton's problem, and this my two colleagues deny (even though they find Tarlton "has stated a cause of action"): " . . . the question of whether the FBI must guarantee the accuracy of information in its files, and similarly . . . the question of whether the FBI must resolve conflicting allegations as to the accuracy of its records. . . . [U]nder present circumstances these latter two questions could not be resolved in Tarlton's favor." (Majority Opinion, p. 1121.)

The majority opinion goes even farther to deny Tarlton any effective relief, indeed, the only relief he asks for. " 'Realistically, the FBI cannot be expected to investigate the facts underlying every arrest or detention reported to it.' . . . Furthermore, in the case of alleged unconstitutional arrests or convictions, the FBI is not authorized or equipped to make judgments concerning what might be difficult questions of constitutional interpretation." (P. 1127.)[10] "Similar reasons limit the re-

---

F.2d 486 (1970), and Menard v. Saxbe, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974).

9. The court's opinion also footnotes "whether the FBI may retain records of police 'detentions' for which it knows that no probable cause for arrest existed. *Menard* (II) decided that such interaction between citizen and police was not the kind of criminal activity which may be included in FBI files. The corollary of *Menard* (II) is that arrests or convictions *known* by the FBI to be unconstitutional are not properly enshrined in FBI files." Note 7.

Although I am in full agreement with our decision in *Menard* (II), I believe our opinion there must be limited to those cases where the FBI later learns that information in its records is inaccurate. The majority here seeks to place an affirmative duty on the FBI to ferret out subsequent information about each arrest entry in their records. It is this additional burden on the FBI which I find unacceptable.

10. In appellant's case, for example, a determination of whether his convictions on more

serious charges (two on theft, one each on assault, burglary, and escape) were obtained in a fair and constitutional manner would require an inquiry into the facts surrounding the arrests and convictions. Records and witnesses would have to be examined to determine if probable cause existed for the arrest, if appellant had been represented by counsel, if the jury had been properly instructed, if the evidence supported the verdict, or if any other defect that one might think of existed. Similarly, to expunge the items reflecting only an arrest without conviction, which appellant challenged by admitting the fact the arrest occurred but denying the probable cause for the arrest, represents a task of infinite, astronomical proportions. Inquiry would have to be made into the background of events long since forgotten, into records sent to archives or destroyed, into the recollection of witnesses dead, missing or forgetful.

Such an inquiry into the "justifiability" of a record item would be indescribably difficult and burdensome upon the best of circumstances, when conducted in a nearby locality

lief United States Courts in this district may legally and practically grant to litigants in Tarlton's position. The District Court cannot review the constitutionality and relitigate the merits of all

covering recent events. The problem would be compounded when as in this case the challenged incidents occurred over twenty years ago in different jurisdictions thousands of miles away. The history of appellant's prior arrests and convictions began in 1950, ended in 1964, and occurred primarily in Texas and New Mexico. At the time of the Parole Board action of which appellant complains, and in which this record was made available to the Parole Board, appellant had been incarcerated since 1966 as a result of a conviction in the U. S. District Court for the Eastern District of Tennessee for forgery of U. S. postal money orders with ensuing sentence of six years.

At present, the FBI has 3,300 employees doing nothing but the routine administrative task of assembling the data of fingerprints and other records. Menard v. Mitchell, 328 F.Supp. 718, 721 (D.D.C.1971). Each day these 3,300 employees must process over 29,000 fingerprints, 13,000 of which are received in connection with arrests alone. In 1973 there were 9,027,700 arrests in the United States reported to the FBI. Federal Bureau of Investigation, Crime in the United States: Uniform Crime Reports—1973, at 121 (Table 24). The number of additional employees that would be required to investigate and verify these 13,000 items per day or 7,000,000 per year is beyond comprehension.

During oral argument appellant narrowed the scope of his requested relief from the infinite to the merely enormous by saying that he would require the FBI to investigate only if requested to do so by a prisoner. We gain little solace from this concession. There are currently in the Federal prison system over 23,071 inmates. Weekly Report, U. S. Department of Justice—Bureau Week of 11 September 1974. It is obvious, of Prisons, Federal Prisoners Confined as appellant's counsel admitted, that the remedy urged here must also be available to those incarcerated in state and local prisons.

11. The proposed remedy here is in truth a rather ingenious way to challenge (1) by collateral attack in a federal court the validity of (2) previous convictions (3) and arrests (4) in all States, (5) with each and every such action possibly to be initiated in the District of Columbia, legal domicile of the Attorney General and Director of the FBI. In this sense, the requested relief is similar to a petition for habeas corpus or

the arrests and convictions in the United States." (P. 1127.)[11]

In these passages my colleagues are facing reality. Yet, the demand, the cause of action, of Tarlton in this case

action under 28 U.S.C. § 2255 (1970). As with other kinds of collateral attack, this remedy would require substantial inquiries into the facts of a case. Unlike these other remedies, however, the action proposed here would result, not in reversal of a conviction, but rather a mere ban on FBI dissemination of the previous arrest or conviction record. In such a court proceeding evidence would be required to support any finding of fact or law requested by the prisoner or ex-prisoner initiating the action. The inquiry in court would necessarily be as detailed as that of the FBI described above. The evidence sufficient to justify a finding by the District Court that a previous conviction in the court of another jurisdiction was "unjustified," i. e., should be null and void, and therefore that all mention of it in the FBI record must be expunged, would likewise necessarily need to be detailed, searching, and convincing. What consequential legal effects such findings of fact and law in this subsequent inquiry by the U. S. District Court would have on the original conviction, in addition to the FBI record expunging, would require a pause to ponder. Nor can we here delineate precisely the standard of proof required of the petitioner to obtain in effect a declaration that a previous conviction is null and void, even for a limited objective. It is sufficient for our purpose here to say that such proceedings could never be *pro forma*, could never be concluded satisfactorily for the petitioner without sufficient evidence to justify overturning a previously valid conviction, and on this basis then to contemplate the burden that authorizing such actions would place on the entire United States court system.

The contemplation of this massive new form of collateral attack inevitably leads one to wonder where all of this litigation will take place. The instant case was brought in the District of Columbia. Appellant was incarcerated in a federal prison in Atlanta, Georgia, in the Fifth Circuit. He was sentenced on the charge, from which he sought parole, by the U. S. District Court for the Eastern District of Tennessee, in the Sixth Circuit. He seeks to have the U. S. District Court for the District of Columbia alter records located in this jurisdiction. These records reflect arrests and convictions that occurred in state courts in Texas and New Mexico. The question of the most convenient forum gives one pause.

is that the FBI either VERIFY or ELIMINATE each and every arrest or conviction from his record. The majority opinion wisely rejects this as neither legally required nor possible in fact. Nothing, certainly nothing which would gratify any of appellant Tarlton's demands, remains of his "cause of action." [12]

### III. "CONSTITUTIONAL ACCURACY"

Despite the specific disclaimer that the FBI need not "guarantee the accuracy of information in its files" (p. 4), the reiterated insistence on establishing "accuracy" or "constitutional accuracy" as a *sine qua non* before the FBI can disseminate any criminal information inescapably puts the FBI in the position of an investigator, a decider, and ultimately a guarantor of the accuracy of every fingerprint arrest record which is submitted to it and later challenged. Even if the obligation of the FBI to determine the accuracy of the fingerprint arrest records in its file is limited to those challenged, the burden on the FBI would be an enormous one never contemplated by Congress.[13] Section 534 does not require or imply that the FBI has the duty of inquiry of the local agency furnishing the fingerprint arrest reports, checking the accuracy of the reports, deciding whether the local agency or the challenger is right, and then disseminating or not on the basis of such a decision.

How my colleagues would change section 534 is seen even by a cursory exam-

ination of the opinion. The opinion is replete with references to "constitutionally accurate arrests or convictions" (p. 1121), "constitutionally accurate criminal files" (p. 1125), and "making reasonable efforts to safeguard the accuracy of the information" before dissemination (p. 1122). The distinction between "constitutionally accurate" and constitutionally *in*accurate arrests and convictions obviously requires *a judgment of constitutional validity by someone*. By whom? The originating local law enforcement agency? The FBI? The U.S. District Court for the District of Columbia? Or, perhaps the *user* of the information before the information is used, particularly in light of the large type disclaimer as to accuracy which the FBI puts on each fingerprint arrest record.

How can this court say that "recognition of the duty on the part of the FBI to make reasonable efforts to maintain *constitutionally accurate criminal files* is but an exercise of judicial authority" (p. 1125)? What does "constitutionally accurate criminal files" mean? If the FBI can only maintain constitutionally accurate files, it means, if I interpret the opinion correctly, records of arrest which are constitutionally invulnerable to challenge. So this puts the FBI inevitably in the position of checking the constitutionality of every arrest record that its disseminates. Nothing could be farther from Congress' intent. Nothing could be farther from practicality.

Let us not forget that we have an individual appellant involved here, hence

**12.** Although this opinion is phrased in such a way as to make clear that no cause of action remains to Tarlton, it could equally well have been put in terms of no subject-matter jurisdiction. In either event, it is obvious that there does not remain an outstanding controversy between Tarlton and the named defendants and as a result there is no jurisdiction in the District Court to undertake the hearing required by the majority.

If the purpose of the remand to the District Court is only to initiate an inquiry as to

what the FBI can and should be doing, *i. e.*, to see if section 534 should be amended, then this is purely a legislative task. If, on the other hand, a remand to the District Court is to be directed to the specific complaint of injustice to the appellant Tarlton, then the appropriate forum is either Georgia, where Tarlton is confined, or Eastern Tennessee, where Tarlton was sentenced.

**13.** See note 9, *supra*.

the user of the FBI assembled data would have been the United States District Court for Eastern Tennessee where Tarlton was sentenced, or the United States Parole Board which has had occasion to consider his post-conviction release. I submit that neither the FBI nor the United States District Court for the District of Columbia is in a *position,* nor do they *need,* to determine for their own purposes the accuracy of the information reposing in the FBI files.

In *Menard* we held: "[S]ound principles of justice and judicial administration dictate that in general actions to vindicate constitutional rights, by expungement of arrest records [should] be maintained against the local law enforcement agency involved."[14] The arrestee challenging the validity of the arrest must start where the arrest occurred. Nothing could be more sensible, and, if followed as a policy, would inevitably result in the FBI records being correct, because the FBI follows a policy of correcting its own arrest records or expunging them as the local authorities do.

## IV. THE POTENTIAL HARM OF INACCURATE ARREST AND CONVICTION RECORDS

Appellant's request that his arrest and conviction records be expunged is based on the fear that he has suffered and may continue to suffer unjustly from prejudice toward those with criminal records. The remedy for such potential harm is not, however, to impose a general duty on the FBI to verify the accuracy and propriety of each item of information in its files. The FBI acts as a mere repository of information; as such there is no harm, in the abstract, in the FBI's accumulation of information.[15] No prejudice to the subject arises until the damaging information is released, possi-

bly not until someone with the capacity of effective action (*e. g.,* a sentencing judge, parole board, or prospective employer in a sensitive occupation) is prepared to take action on the basis of it.

The record of arrests and convictions is submitted on the basis of *fingerprint identification only,* mathematically established to be the freest from error of any known method of human identification. If a source other than fingerprints is used, it is specially noted "as investigative leads as being possibly identical with subject" (see Appendix). To illustrate, appellant's arrest and conviction record here (see Appendix), which he demands be "corrected," is comprised of one- to three-line entries reflecting fingerprinting at the time of arrest or conviction. No other source was used. The first time appellant Tarlton was arrested, fingerprinted, and the prints transmitted to the FBI, the FBI set up a fingerprint file in its criminal records on a person bearing these distinctive identifiable prints and giving the name to the arresting authorities of John Brent Tarlton, Jr. This person may have been arrested before without being fingerprinted, or arrested and fingerprinted without the prints being forwarded to the FBI; the FBI does not know nor inquire. The FBI only receives and records original and subsequent arrest and conviction data on the basis of fingerprints, not by name or other descriptive data, unless specially noted. As to the accuracy of the system, it is significant that appellant Tarlton does not contest the accuracy of a single entry in his arrest and conviction record entirely based on fingerprints; his challenge is to "probable cause" for arrests and "justification" for convictions, issues which the fingerprint classifier at the FBI has no way of resolving.

---

14. United States v. Menard, *supra,* 498 F.2d at 1025.

15. *See* Laird v. Tatum, 408 U.S. 1, at 10, 12–13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

However, the FBI has long since taken precautions to assure that users of FBI information know that the reports or "rap sheets" are not warranted by the FBI to be accurate in every detail. Each such "rap sheet" carries the warning that

Information shown on this Identification Record represents data furnished FBI by fingerprint contributors. WHERE FINAL DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE IS DESIRED, COMMUNICATE WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS.

This *caveat* assures that users do not grant too much weight to reports merely because the information is supplied by the FBI. This is essentially an acknowledgement by the FBI that it is a repository rather than a guarantor of information.

This role of the FBI was reaffirmed by the Congress in 1971 when it passed, after the U.S. District Court decision in Menard v. Mitchell, *supra*, which might have been deemed to restrict the FBI in its customary dissemination of arrest and conviction data, a statutory redirection to the FBI to disseminate the arrest and conviction records, not only to courts and law enforcement agencies, but also

for the exchange of identification records with officials of federally chartered or insured banking institutions to promote or maintain the security of those institutions, and, if authorized by State statute and approved by the Attorney General, to officials of State and local governments for purposes of employment and licensing, any such exchange to be made only for the official use of any such official and subject to the same restriction with respect to dissemination as that provided for under the aforementioned Act.[16]

This represents an up-to-date statement by Congress of its considered judgment as to the proper role of the FBI in the collection, collation, and dissemination of arrest and conviction data. Unless appellant can point convincingly to some constitutional barrier to the exercise of this function by the FBI as Congress understood it most recently to be, and he has not done so, this Congressional mandate governs.

In assaying the potential harm to appellant from the use of the FBI arrest and conviction data, we are urged to consider the incompleteness and flimsiness of all but four or five items in the criminal record—arrests with no conviction thereafter recorded, arrests and convictions for vagrancy, convictions for drunken driving. All this is obvious to appellant's counsel, obvious to us, and also, I suggest, obvious to the experienced U.S. District Judge in Eastern Tennessee, who sentenced appellant to serve six years for forgery, and obvious to the Parole Board considering for the first time appellant's eligibility for parole from Atlanta Penitentiary.[17] The five serious convictions—two for theft, one each for assault, burglary, and escape from confinement—were doubtless

---

16. Pub.L.No.92–184 (15 Dec. 1971), § 902.

17. Appellant argues " . . . his present imprisonment is a direct result of the information whose accuracy he is challenging." (Brief, p. 26.) I suggest his imprisonment is a direct result of being found guilty by a federal jury and judge of forging a U. S. postal money order, a conviction whose accuracy appellant has *not* challenged.

Appellant further asserts, " . . . Appellant [is] languishing in prison because of the information he seeks to challenge,

. . . " (Brief, p. 27.) We have no way of knowing what evaluation the Parole Board made of his previous record; my understanding is that the Parole Board customarily gives primary consideration to the record of the inmate since entering prison. If it is true that the Parole Board characterized his record as that of a "professional criminal," this was doubtless with reference to the five serious offenses which appellant wants to challenge—plus the unchallenged forgery conviction.

evaluated differently. Just how differently we have no way of knowing on this record. We have no way of knowing, for example, how much (if any) of what appellant now says about these convictions was conveyed to the probation officer in the Eastern District of Tennessee, how much was included in the probation officer's presentence report (if any was rendered) to the District Judge, and what access the Parole Board had or consideration it gave to a presentence report or the sentencing proceedings in court.

The named party defendants (appellees) in this proceeding are the Attorney General of the United States and the Director of the FBI. To the extent that appellant's pleas for relief suggest that we should direct the United States District Court for the Eastern District of Tennessee how to conduct its business, I think we have neither authority nor desire to do so. The same goes for the United States Board of Parole. On the other hand, to the extent that we can fashion procedures in the United States courts in the District of Columbia to avoid the type of prejudice to others which appellant asserts has harmed him, we should do so.

## V. FEASIBLE PROTECTION AGAINST USE OF INACCURATE ARREST AND CONVICTION DATA

### A. *In Judicial Proceedings*

In proceedings in which information may be used to an individual's detriment, if we give recognition both to fairness and a desire to act on only the most accurate information, it is most obviously necessary that he be able to obtain and examine the FBI fingerprint data of arrests and convictions. Without this right, the individual cannot hope to know if the information is complete and accurate, or even perhaps if the report is actually his own. Unless an individual has such access, he will not know if he should attempt to obtain

correction of erroneous or incomplete information by the supplier.

In a great majority of cases in the U. S. District Court in the District of Columbia the defendant or his counsel has access to the FBI "rap sheet" (fingerprint record of arrests and convictions) as a matter of practice if not of right. This may occur at different stages of the trial. Depending on the trial tactical situation, the prosecuting attorney may show the "rap sheet" to defense counsel prior to trial in the hope of inducing a guilty plea. For the same reason, this is sometimes done at the close of the prosecutor's case, in an attempt to emphasize the hopelessness of defendant's position. Or, prior to making a decision whether to put his client on the stand, defense counsel may request to see the record of prior convictions, in order to ask the judge to rule in advance which convictions will be admissible for impeachment purposes. Such advance rulings are customarily given in this Circuit, although not as a matter of right. At the close of trial, if there has been a conviction, in the preparation of a presentence report the probation officer customarily asks the defendant or his counsel to comment on the previous convictions, and presumably this information is incorporated in the presentence report given the District Judge. Finally, we are aware of the practice of most District Judges, although under Rule 32 they have a discretion as to what parts of the presentence report (if any) they reveal to the defendant or his counsel, to inform the defendant in open court of the record of prior convictions the judge will take into consideration in sentencing, and to invite comment thereon.

From the numerous records in previous cases on appeal in this jurisdiction we are aware that the above is customarily done, but not as a matter of right to the convicted accused. I suggest that as a matter of due process the FBI fingerprint record of both arrests and convictions, the record made the subject of this litigation, should be given to the ac-

cused or his counsel, if a conviction is obtained, for comment as to accuracy. Logically this should be done immediately after conviction, if it has not been done before, in order that defense counsel may confer with his client and then inform both the probation officer and the prosecuting attorney of any discrepancies in the FBI record which the accused now convicted wishes to challenge.[18] This will give the probation officer the opportunity to make his check, and likewise the prosecution the opportunity to rebut any claim of the defendant while the probation officer is making his other investigation and preparing his report for the judge. When the day comes for sentencing, the judge will have the presentence report and should inform the accused of the criminal record which he is taking into consideration and of the facts regarding the criminal record as found by the probation officer. The prosecution can make its own statement as to the facts it found regarding those arrests and convictions challenged by the defendant. On this basis the judge can sentence, clearly and on the record taking into consideration only that criminal record which the court is fully satisfied is accurate.

### B. *Before the Parole Board*

We are not asked to assert any jurisdiction or supervisory power here (even assuming this court should), but a practice similar to the above practice, which we believe the District Judges here are in the vast majority of cases already utilizing and have found feasible, may commend itself to the Parole Board. If the Parole Board would give every inmate a chance to comment on the accuracy of his previous record, coupled with the warning that frivolous or false challenges would not aid his cause,[19] the fairness of the action of the Parole Board would be enhanced; certainly its visible fairness would, and the complaints of those such as appellant would be stilled.[20]

### C. *In FBI Data Files*

In conclusion, I turn to the records of the agency charged by law with the responsibility of acquiring, collecting, classifying, preserving, and exchanging data on individual arrests and convictions. The input from law enforcement agencies, that which they voluntarily supply, is now enormous and well systematized. I suggest it is time that equal effort be devoted to voluntary corrections and supplementation of original law enforcement data.[21]

18. To discourage bad faith allegations by defendants, and a concomitant waste of manpower resources in chasing down phony claims, the judge or probation officer should make it clear to the defendant personally, at the time the criminal record is turned over to the defense for comment, that any patently frivolous or false challenges to the accuracy of the FBI record will be duly reported by the probation officer to the judge to be considered at the time of sentencing.

19. See note 18 *supra*.

20. In many cases the inquiry directed to the inmate would be only to ask if the prisoner had any additional information to submit beyond that furnished the trial court at the time of sentencing.

21. During the hearings on confirmation of Clarence M. Kelley as the nominee for Director of the FBI, Senator Roman Hrus-

ka of Nebraska suggested that it would be sound policy for FBI records to be complete and disclosed to the individual involved. Washington Post, 20 June 1973, § A, at 1, col. 3, con'd at § A, p. 9, col. 1.

It may be that it would be sound policy to permit all citizens to have access to their FBI fingerprint record; it is clearly within the power of Congress to create such a general right. Courts, however, must deal in the contest of actual harms to existing rights; there simply is no basis for contending that the mere compilation of records, without more, constitutes a harm sufficiently immediate to warrant court intervention. Laird v. Tatum, *supra*, so holds:

The decisions in [certain] cases fully recognize that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights. At the same time, however, these decisions have in no way eroded the

Almost every police force in the country is furnished with forms on which fingerprints taken in connection with an arrest or conviction can be reported to the FBI. Those same police forces and other law enforcement agencies should be equipped with a similar fingerprint form, on which an individual could request and have recorded his fingerprints and a correction or completion of a fingerprint record he is aware has probably been submitted to the FBI, *e. g.*, failure to charge after arrest, dismissed or acquitted after formal charges have been brought. The agencies themselves *should* do this, but there is no feasible way to compel them to do so; a workable way for the affected individual to help himself should be a vast improvement.

In addition to the right of correction and completion, there should be a limited right to explain or clarify information that is in an FBI file. It may, for example, be that an arrest or conviction has subsequently been held unconstitutional. An individual should be able to point this out in some brief way in order to assure that an ultimate using agency does not rely on information which is unfairly prejudicial, although I think it crystal clear that there is no space for complex constitutional argument on an FBI "rap sheet."[22]

On pages 1128–1130 of the majority opinion my colleagues make several other suggestions for improving the accuracy and fairness of the FBI criminal data collection and dissemination, most of which appear worthy of serious consideration. These suggestions are addressed to the District Court as possible subjects of its "inquiry." The majority opinion emphasized that all of these suggestions are subject to the primary test of feasibility and practicality, as the District Court may determine.

This emphasizes my primary disagreement with my colleagues. The question of what is administratively practical and feasible for the FBI in carrying out its duties under the statute is primarily for the FBI to determine. If any oversight as to how the FBI is carrying out its duties is needed, this should be exercised by a Congressional committee in appropriate legislative hearings; especially since my colleagues have eschewed any constitutional ground for their decision, a court's intervention is not called for.

For all of the above reasons, I respectfully dissent.

## APPENDIX

For the purpose of this appeal we take appellant's FBI arrest and conviction record ("rap sheet") as he has alleged it to be. Note 5, *supra*. The majority holds that appellant Tarlton is not entitled to "a requirement that the FBI resolve factual or legal issues that might arise if the allegations of the individual subject of the record and the statements of the local law enforcement agency conflict. Neither could the exercise of such a duty give rise to a legal obligation on the part of the FBI to guarantee the accuracy of records which are the subject of an FBI request to a local law enforcement agency." (Majority Opinion, p. 1129.)

———◆———

"established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action . . . . " Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

408 U.S. at 12–13, 92 S.Ct. at 2325.

22. *Cf.* Consumer Credit Protection Act § 611, 15 U.S.C. § 1681i (1970) which provides a limited right to challenge credit bureau data.

An examination of appellant's actual FBI record, furnished and made a part of the record on appeal after oral argument, shows appellant has even less ground for claiming harm than by reason of the record he alleged. On five pages there are 34 entries, only 6 of which are "incomplete."

The first two, car theft December 1950 and burglary 1953, have no disposition shown, although these are two serious charges appellant informs us resulted in convictions; appellant's challenge is to the "justification" for the convictions because of asserted absence of counsel. But as the record stands, these two incompletions are favorable to appellant; two convictions are not shown.

The third, drunk and assaulting officer April 1958, and fourth, highway violation November 1960 (probably appellant's U-turn), appellant himself does not contest and treats as minor offenses (see text, *supra,* following note 4).

The fifth, vagrancy March 1961, has no disposition shown, but is a type charge whether resulting in dismissal or conviction which would have no impact on a sentencing judge or parole board. Of the sixth, driving while intoxicated and no operator's license in possession August 1962, the same might be said, and this arrest may be one of the four minor charges of which appellant himself makes no complaint.

I conclude that appellant Tarlton *suffered no prejudice whatsoever because of the incompleteness* of his FBI fingerprint record. If we complete the first two omissions with the convictions for the two serious charges of car theft and burglary appellant informs us he actually received, complete the third and fourth omissions with convictions for the minor charges of drunkenness and a highway violation which appellant does not contest or ask for any action in regard thereto, and postulate acquittals on the last two minor charges of vagrancy and DWI, then appellant's record *complete* looks considerably *worse than* it does incomplete.

To the uninitiated in examining these records (which certainly does NOT include trial judges, probation or parole authorities) I point out that a blank in the "disposition" column does not mean the story is incomplete. The story may already be complete, or the "Disposition" may be shown by another entry. For example, on page one of appellant's record immediately following, "ATM" (Fisher County) 10 March 1954 was disposed of 7 October 1954 by a conviction and sentence of five years for assault with intent to murder ("ATM" translates as either "Attempt to Murder" or "Assault to Murder"), of which appellant served three years, being discharged 25 March 1957.

As a final example, the last three entries on page five, which carry nothing in the "Disposition" column, are complete in themselves. These three entries relate the sad tale of how appellant Tarlton was arrested for carrying a prohibited weapon 12 February 1973, brought up for parole revocation 28 March (instead of being charged with the additional new offense), and by 6 June 1973 was safely lodged back in his old quarters in U. S. Penitentiary, Atlanta, Georgia, on his old conviction for forging and uttering U. S. postal money orders.

**1144**

FEDERAL BUREAU OF INVESTIGATION
WASHINGTON, D.C. 20537

The following FBI record, NUMBER 470 306 A, is furnished FOR OFFICIAL USE ONLY. Information shown on this Identification Record represents data furnished FBI by fingerprint contributors. WHERE FINAL DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE IS DESIRED, COMMUNICATE WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS.

| Contributor of Fingerprints | Name and Number | Arrested or Received | Charge | Disposition |
|---|---|---|---|---|
| Police Department Hobbs, New Mexico | John Brent Tarlton Jr | February 7, 1950 | Investigating burglary | Released to Juvenile |
| Sheriff's Office Vernon, Texas | John Brent Tarlton Jr #A-3106 | July 13, 1950 | Car Theft | Jailed in default of perfecting a $750.00 bond |
| Police Department Snyder, Texas | John Tarlton #726 | November 8, 1951 | Investigation | Released |
| Sheriff's Office Rankin, Texas | John Brent Tarlton #253 | December 25, 1952 | Car Theft | |
| Sheriff's Office Roby, Texas | John Brent Tarlton Jr | November 20, 1953 | Burglary | |
| Sheriff's Office Lubbock, Texas | John B Tarleton Jr #7803 | March 10, 1954 | "ATM" (Fisher County) | |
| Texas Prison System Huntsville, Texas | John Brent Tarleton Jr #130971 | October 7, 1954 | Assault with intent to murder (1) Burglary (3) 4-2 to 5 "con") | 5 years March 25, 1957 Discharged |
| Sheriff's Office Andrews, Texas | John Brent Tarlton Jr | November 16, 1957 | carrying concealed weapon | Fined $321.45 |
| Police Department Big Spring, Texas | John B. Tarlton #1744 | January 13, 1958 | Drunk | $15.00 fine |
| Sheriff's Office Big Spring, Texas | John Tarlton #14364 | April 12, 1958 | Drunk and Assaulting Officer | |

| Contributor of Fingerprints | Name and Number | Arrested or Received | Charge | Disposition |
|---|---|---|---|---|
| Sheriff's Office Monahans, Texas | John Brent Tarlton Jr | February 17, 1959 | Theft Under | 30 days |
| Police Department Lovington, New Mexico | John Brent Tarleton Jr #A-1923 | July 13, 1960 | Drunk | Justice of the Peace Court 90 days jail with no suspended |
| Sheriff's Office Lovington, New Mexico | John Brent Tarleton Jr #9134 | July 13, 1960 | Drunk/Selling Anothers Property | 60 days |
| Sheriff's Office Odessa, Texas | John Brent Tarlton #6881 | November 27, 1960 | Highway Violation | |
| Sheriff's Office Snyder, Texas | John Tarleton #168 | January 10, 1961 | Carrying Concealed Weapon | $126.35 fine and cost |
| Sheriff's Office Odessa, Texas | John Brent Tarlton #6881 | March 5, 1961 | Vagrancy | |
| Police Department San Angelo, Texas | John Brent Tarleton Jr #12126 | October 29, 1961 | Vagrancy | Fined $15.00 |
| Sheriff's Office Snyder, Texas | John Brent Tarlton Jr #168 | June 12, 1962 | Drunk | $20.50 fine |
| Police Department Lovington, New Mexico | John Brent Tarlton Jr #A-2728 | August 8, 1962 | Driving While Intoxicated No Operators License in Possession | Pled Not Guilty Bond set as $500 Blood Alcohol Test 2.5% |
| Sheriff's Office Odessa, Texas | John Brent Tarlton #6881 | October 28, 1963 | Drunk | Fine and cost, $44.50 |
| Police Department Odessa, Texas | John Brent Tarlton #P-19592 | November 13, 1963 | Drunk | $25 Fine |
| Sheriff's Office Perryton, Texas | John Brent Tarlton #2546 | June 26, 1964 | Felony Theft | No Billed Released |

| Contributor of Fingerprints | Name and Number | Arrested or Received | Charge | Disposition |
|---|---|---|---|---|
| Police Department Berger, Texas | John Brent Tarlton Jr #7609 | August 6, 1964 | Drunk Pedestrian | $15.00 fine |
| Police Department Midland, Texas | John Brent Tarlton Jr #23065 | February 10, 1966 | Drunk | Fined $25.00 |
| Police Department Chattanooga, Tennessee | John Brent Tarlton Jr #23144 | May 10, 1968 | Fugitive from California | Released to Federal Authorities |
| United States Marshall Chattanooga, Tennessee | John Brent Tarlton #630 | May 11, 1968 | Passing stolen postal money orders | |
| United States Penitentiary Atlanta, Georgia | John B. Tarlton Jr #92165 | June 28, 1968 | Forging United States Postal Money Orders Uttering and Passing Forged Money Orders | 6 years |
| Police Department Atlanta, Georgia | John Brent Tarlton Jr #278354 | October 18, 1970 | United States Prisoner on Writ | |
| United States Penitentiary Atlanta, Georgia | John B. Tarlton #92165-131 | November 2, 1970 | Forging and Uttering United States Postal Money Order | 6 years Received as #92165-131 from United States Penitentiary Atlanta (round trip) |
| SO Post Texas | John Brent Tarlton Jr. #390 | 6-19-72 | Drunk Profane Language Destroying Public Property | $34.00 on drk chg |
| PD Snyder Texas | John Brent Tarlton Jr 405 | 10-6-72 | drunk in public 4200 | bond forfeited |
| SO Snyder Texas | John Brent Tarleton Jr 168 | 2-12-73 | Carrying a Prohibited Weapon | |

| Contributor of Fingerprints | Name and Number | Arrested or Received | Charge | Disposition |
|---|---|---|---|---|
| USM Lubbock TX | John Brent Tarlton Jr 01950 | 3-28-73 | mandatory rel violator (Orig. Offense Forging US Postal Money Order & Uttering & Passing US Postal Money Order | |
| US Pen Atlanta Ga | John B. Tarlton 92165 131 | 6-6-73 | Forg & Utt P.M.O.'s· | |

Since neither fingerprints nor an identifying number which is indexed in our files accompanied your request, FBI cannot guarantee any manner that this material concerns the individual in whom you are interested.

Notations indicated by * are NOT based on fingerprints in FBI files but are listed only as investigative leads as being possibly identical with subject of this record.

IDENTIFICATION DIVISION

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
IDENTIFICATION DIVISION
WASHINGTON, D. C. 20537

G

The following information from FBI record, NUMBER 470 306 A, is furnished FOR OFFICIAL USE ONLY.

All descriptive factors (if any) furnished by you match those in our identification file unless herein quoted.

Description and Related Data:

Race: W
Sex: M
Height: 68"
Weight: 146 lbs.
Hair: brn
Eyes: hazel
Date and Place of Birth: 4–22–32 Henderson Texas
Scars and Marks: scar on left arm
Address: 1911 Ave E. Snyder Texas (in 1973)
Occupation: Laborer

Since neither fingerprints nor an identifying number which is indexed in our files accompanied your request, FBI cannot guarantee any manner that this material concerns the individual in whom you are interested.